## WILLIAM W. SHEARER ET AL.

## v.

## THE PACIFIC EXPRESS COMPANY.

*Carriers—Express Companies—Delivery of Package to Wrong Party.*

Express companies are insurers for the safe delivery of packages intrusted to their care and nothing can excuse them from this obligation except the act of God or of the public enemy. No circumstance of fraud, imposition or mistake will excuse the delivery, by a common carrier, of a package to the wrong person.

[Opinion filed February 9, 1892.]

APPEAL from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding.

Messrs. BARNUM & BARNUM, for appellants.

Messrs. JAMES FRAKE and W. W. MORSMAN, for appellee.

MORAN, J. Appellants had, for a number of years prior to the happening of the circumstances giving rise to this case, conducted business at the stock yards in Chicago, under the firm name of W. W. Shearer & Co. For some time prior to April 22, 1889, said firm had dealings with one J. C. Stubblefield, who was engaged in buying stock in Kansas, Missouri and Texas, and who from time to time applied to Shearer & Co. for an advance of money, which they sent him in the form of drafts, letters of credit, and money by express. In April, 1888, said J. C. Stubblefield was at Chetopa, in Kansas, and telegraphed appellants for $700, and it was sent to him in a draft, and he was there identified at the bank and received the money for the draft; Stubblefield was acting for himself in the purchase of cattle, and not as an agent for appellants. On April 21, 1889, about midnight, this J. C. Stubblefield arrived in Chetopa, Kansas, from Texas. He got off the train and went to a hotel, a short distance from the depot, but did

not register his name at the hotel, giving as a reason, that he was tired and desired to go to bed. At the same time, and from the same train, another man got off at Chetopa, and went to another hotel in the town farther away from the depot than that to which J. C. Stubblefield went. This man claimed to be named J. C. Stubblefield, but as the facts show, for a fraudulent purpose. The genuine J. C. Stubblefield the next morning met an acquaintance in the town, and took a ride with him in a buggy, and some time during the afternoon left Chetopa on a freight train for Parsons, and went from there to Coffeyville. The other man, whom we shall designate as the impostor, went to the telegraph office in the depot at Chetopa, and sent the following telegram:

"CHETOPA, KANSAS, April 22, 1889.

To W. W. Shearer & Co., Union Stock Yards, Chicago. Express me $4,000 to-day; Chetopa. Answer.

J. C. STUBBLEFIELD."

The impostor had not registered at the hotel at which he stopped, which was kept by a Mr. Davenport. After having sent the above telegram to the appellants he returned to the hotel, and said, "Mr. Davenport, if a telegram should come here to J. C. Stubblefield, if there are any charges on it, you pay it, and I will settle with you." Davenport asked him if that was his name, and he replied in the affirmative. Davenport then informed him that a messenger boy had been there with a telegram for J. C. Stubblefield, and told him where he could find the boy. Soon after, the impostor informed Davenport that he had received the telegram. This telegram was the answer from W. W. Shearer & Co. to the message sent them in the morning, and was as follows:

"UNION STOCK YARDS, CHICAGO, ILL., 22.

To J. C. STUBBLEFIELD: Sent money as ordered to-day. Wire me full particulars on receipt of this. W. W. SHEARER."

In reply the impostor sent the following:

"CHETOPA, KANSAS, 22.

To W. W. SHEARER & Co.: Bought 240 corn fed Texas. Top of 300 at $20 a head. J. C. STUBBLEFIELD."

During the forenoon of April 22d, the impostor had given

orders to the railroad company for eleven stock cars to be set on the track for his use for the purpose of shipping cattle to be shipped by him on the 24th of April. He informed Davenport that he was buying cattle to ship from Chetopa, and that he was expecting money from Chicago with which to pay for them; that he had ordered the money from plaintiffs by telegraph. On the morning of the 24th he called on the agent of the appellee Express Co., and asked if there was a package there for Stubblefield. The agent asked him if his name was Stubblefield, to which he replied, "It is." Being asked what were his initials he replied J. C. The agent then said there was a package for J. C. Stubblefield, and asked the impostor, "What identification have you?" He then took from his pockets two accounts of sales, and a telegram, and handed them to the agent. The telegram was the one signed by Shearer & Co., and addressed to J. C. Stubblefield at Chetopa, a copy of which is above set out. The accounts of sales show transactions between J. C. Stubblefield and appellants wherein appellants have sold in Chicago cattle consigned to them by J. C. Stubblefield. The agent then asked the impostor, "Is there anybody here with whom you are acquainted?" To which he replied, "Nobody except the landlord." The impostor then brought in Davenport, the landlord, and stated that he came after the package. The agent inquired of Davenport if he was acquainted with this man. Davenport said, "I am." The agent then asked, "Who is he? what is his name?" Davenport replied, "J. C. Stubblefield." The agent asked, "How do you know that is his name?" Davenport said, "At least that is the only name I ever knew him by; besides he has been stopping at my house several days; nearly a week. He is also on the trade with some parties west of the town for some stock. He has got the cars ordered; they are now on the track at the depot." The agent then asked the imposter, "What are you looking for?" He said, "A package of money." The agent asked, "How much?" He answered, "$4,000 from W. W. Shearer & Co., Chicago, Ill." The agent then delivered the package of money to the impostor, he receipting for it in the name of

J. C. Stubblefield, and Davenport signing his own name as identifying Stubblefield. The impostor then directed Davenport to retain a room for him as he would be back that night, and took a train for Coffeyville, and was not thereafter seen in Chetopa. The genuine J. C. Stubblefield left Coffeyville on April 24th, and came to Chicago, where he at once called at the office of the appellants, and it was then discovered that a trick had been played, and steps were taken by Shearer and Stubblefield to stop the payment of the money, but it was then too late.

On the trial before the court without a jury there was a finding and judgment in favor of the express company. The rule as to the liability of express companies to safely deliver matter intrusted to them is thus stated by our Supreme Court: "They become insurers for safe delivery; being so, nothing can excuse them from their obligation safely to carry and deliver, but the act of God or the public enemy. * * * Express companies have so many opportunities to do wrong, so many temptations are spread out before their employes, and such is the necessity of intrusting them, every presumption should of rights be against them, and should prevail unless rebutted."

Hutchinson on Carriers, Sec. 344, thus states the rule with reference to delivery: "No circumstances of fraud, imposition or mistake will excuse the common carrier from responsibility for a delivery to the wrong person; the law exacts of him absolute certainty that the person to whom the delivery is made is the party rightfully entitled to the goods, and puts upon him the entire risk of mistake in this respect, no matter from what cause occasioned, however justifiable the delivery may seem to have been, or however satisfactory the circumstances or proof of identity may have been to his mind, and no excuse has ever been allowed for a delivery to a person for whom the goods were not directed or consigned."

In support of this rule the author cites numerous cases in which the carrier has been held responsible for a delivery to a person not entitled to the goods, and among them many cases resembling in their facts and circumstances the case now under consideration.

In American Express Co. v. Fletcher, 25 Ind. 492, a person claiming to be J. O. Riley applied at a telegraph office to have a message sent, signed J. O. Riley, requesting a remittance of money to his address. The message was sent, and the money forwarded by an express company, as requested, and received by the agent of the company at the place from which the message was sent. The same person was express agent and telegraph operator, and he paid over the money to the person who had sent the telegraph message. It turned out that this person was a swindler. It does not appear from the case that there was a real J. O. Riley, but it is assumed that there was. It was held that the express company was liable in delivering the money without further proof of the person to whom it was delivered being the right party than the mere fact that he had sent the dispatch, in response to which the money was received.

In American Express Co. v. Stack, 29 Ind. 27, a person who had knowledge that certain goods were in the possession of the wife of one James Stack, and that said James Stack was absent from her, telegraphed to her in the name of her husband to send goods to his address. She sent the goods by the express company, as directed, at the same time writing a letter addressed to James Stack, at the place to which the goods had been forwarded, telling him that they had been sent as he directed. This letter came into the hands of the swindler, as he had pre-arranged. He then demanded the goods of the company, showing this letter, and describing the goods, as proof that he was the genuine James Stack. The agent refused to deliver the goods to him without further evidence of identity, and he produced to the agent of the company a person known to said agent, who stated the man's name to be James Stack, as he honestly thought it was. The goods were then delivered, and it turned out that the man was not the real James Stack to whom the goods had been sent. The company was held liable.

In Palm v. Watt, 7 Hun, 318, one Raleigh took the name of John M. Gillespie while temporarily staying in Texas, and

in such name wrote letters to the mother of the true John M. Gillespie, representing himself to be that person, who had not been heard from for some time, and asking assistance to enable him to return. The mother wrote a letter, and inclosed a check payable to the order of John M. Gillespie, San Saba, Texas. The letter was taken out of the office by Raleigh, and the check indorsed by him with the name of John M. Gillespie, and the money paid on it by one Ward. The indorsement was held to be a forgery. In denying Ward's right to recover on the check, it is said by the court:

" It is urged that the possession of the letter which inclosed the check, and which was addressed and written to one John M. Gillespie, enabled Raleigh the more easily to personate Gillespie, and thus deceive Ward. · This is no more true than it would be in the case of any thief who had stolen a letter addressed to a third party, inclosing a check to the order of such party, and who brought the check to the bank with such stolen letter as the evidence of his identity."

In Sword v. Young, 89 Tenn. 126, "one J. F. Gillenwaters, over the assumed and fictitious name of 'Charles G. Magrauder,' wrote to Sword & Son, of Cleveland, Ohio, to send a brick machine. The machine was shipped and came to Knoxville on the cars of the defendant company. Shortly after its arrival Gillenwaters presented the bill of lading made in the name of Charles G. Magrauder, demanded the machine, which was delivered to him, paid the freight and receipted in the name of Charles G. Magrauder. He was not required to identify himself as the consignee, nor was the bill indorsed. The court, in deciding the case, holding the carrier responsible, quote the rule as stated by Chancellor Kent, that a common carrier is in the nature of an insurer, etc., and say: "It can make no difference that the defendant carrier thought because Gillenwaters had the bill of lading that he was Charles G. Magrauder. If he was a stranger, as the proof shows him to be, it was the duty of the carrier to have required him to identify himself as the consignee, or his rightfully constituted agent. By its failure Gillenwaters was enabled to practice that fraud intended to be guarded against by the rule from

Kent" (the obtaining of goods by false pretenses). "That Gillenwaters succeeded in deceiving the complainants by representing himself as Magrauder is no excuse for the defendants for its failure to use an effort to discover his true character. * * * There is no difference between this case and one in which a consignment has been made to an actual person, and the goods delivered by accident, mistake or carelessness to a cheat who represents himself as the real consignee. It is necessary in both to have proof of identity, or authority to receive."

Price v. Railroad Company, 50 N. Y. 213, is similar in its facts to the case last quoted. There the swindler sent a letter in the name of a fictitious firm requesting goods to the address of the firm. When the goods arrived a stranger to the defendant's agent paid the freight on them, and was permitted to take them. The person to whom they were delivered was the same person who had sent the letter signed with the name of the fictitious firm to the plaintiff, and he obtained the goods by falsely assuming to be the party to whom they were consigned. The company was held liable for failing to deliver to the right consignee, or on failing to find him, not notifying the consignor.

It will be noticed that in several of these cases the sender of the money or consignor of the goods had knowledge of a real person of the name used by the personator, and sent the goods or money on a request not coming from the real person, but sent in his name by the personator, and that the deliveries by the carriers were induced by the personators being known to them as the persons who really requested the forwarding of the goods or the money in the name of the real person. In this case there can not be the slightest doubt that Shearer & Co. supposed that the request for the money came from J. C. Stubblefield, with whom they had dealt, with whose personality they were acquainted, and to whom they had at different times prior to this date sent money. When they consigned the money, they consigned to him, and the carrier could only excuse himself by delivering it to him; that he did not deliver it to him is admitted, and that instead he did deliver it

to one who falsely personated J. C. Stubblefield both in sending the request for the money, and in receiving it from the express company. It is folly to contend that Shearer & Co. intended the money to be delivered to a man who sent them a dispatch signed by the name J. C. Stubblefield, and neither did they direct it to be so delivered. They designated the consignee by his true name and by so doing directed the delivery of the money to him only. It was the duty of the express company to strictly observe directions and deliver it to J. C. Stubblefield, the consignee. A failure to do so, not induced by any negligence of the consignor, whatever the circumstances of fraud or imposition that brought it about, will not excuse the carrier. He delivers at his peril, and the question of his care or diligence, be it ever so great, is not a factor in the decision of any given case—is not to be considered—unless there is contributory negligence by the consignor. And so are all the authorities. In addition to those already cited, see Cone v. Watkins, 26 Kans. 691; Southern Express Co. v. Van Meter, 17 Fla. 783; Winslow v. Vermont Ry. Co., 42 Vt. 700.

There is another class of cases where the swindler was known in his personality to the seller of the goods, to whom he falsely represented himself to be a person of a certain name, and by whom he was dealt with by said false name, and goods purchased by him consigned to him by such false name, and where to him who had so purchased the goods by the false name the carrier delivered them. In such cases the delivery is to the very person whom the consignor had in mind and to whom he intended they should be delivered, and who was known to him by the false or assumed name, and whom, in addressing the consignment, he identifies by such false name. Such cases are Dunbar v. Boston, etc., Co., 110 Mass. 26; Edmunds v. The Merchants' Dispatch Co., 135 Mass. 283. A different circumstance distinguishes Samuels v. Cheeny, 135 Mass. 278, from cases in which the carrier is held liable for a wrong delivery. In that case there were at Saratoga Springs two persons named A. Swannick, one a reputable merchant having a permanent place of business, the other a person who rented a shop and

secured a numbered box at the postoffice. The latter wrote to the plaintiffs for a bill of goods to be consigned to him, giving his address as " A. Swannick, P. O. Box 1595, Saratoga Springs, N. Y." The plaintiffs supposed that the letter came from the responsible Swannick, though it does not appear that they knew him, or had ever dealt with him before. They consigned the goods as directed, and wrote a letter inclosing a bill for the goods to A. Swannick, postoffice box 1595. This letter the swindler received, as it came to his box, and the goods were delivered to him without any farther identification after they were offered to the responsible Swannick, who had not ordered any goods and who refused to receive them. The court held the carrier not liable, as the goods were delivered to the very person to whom they were sold and consigned, and to whom the letter inclosing the bill for the goods was addressed. Hoge et al. v. First National Bank, 18 Ill. App. 501, may be properly classed with Samuels v. Cheeny. See U. S. v. National Exchange Bank, 45 Fed. R. 163.

We think it clear on principle as well as authority that the delivery of the money in this case to the impostor was not a discharge of the company from the responsibility which it undertook when it received the package consigned to J. C. Stubblefield, Chetopa. The circumstances of which the impostor availed himself to impose upon the express agent were specious and were of a character calculated to inspire belief that he was indeed J. C. Stubblefield, but he was not; and however well calculated the circumstances were to deceive and impose upon the agent, they form no excuse to the company for a wrong delivery. If the impostor's fraud induced Shearer & Co. to transmit $4,000 by express to Chetopa, consigned to J. C. Stubblefield, that was the extent of the fraud which he perpetrated on them; that he induced them to forward the money to Stubblefield was no excuse for the carrier delivering the money to him or to any one else than the J. C. Stubblefield to whom it was consigned. There is some contention by appellee that the genuine J. C. Stubblefield was in collusion with the impostor for the perpetration of the fraud.

There are in the record some circumstances which might give
rise to a suspicion that J. C. Stubblefield knew more of the
impostor than he now admits, but we think these circumstances
too slight to support the conclusion that he was actually a con-
spirator with the impostor. If, however, he was in such
conspiracy, we do not perceive how that fact can relieve
appellee from responsibility; he was still the consignee named
by Shearer & Co. to receive the money. It was not delivered
to him nor upon his order, nor by his procurement evidenced
in any such manner as would enable Shearer to hold him for
the money. The express company have disobeyed the con-
signor's direction, and they have no command or authority
from the consignee which justifies or excuses such disobedi-
ence. Whether Stubblefield was engaged in the attempt to
defraud appellant of money or not, delivery of the money to
him by the carrier would have been a fulfillment of its duty.
Its contract was to deliver the money according to direction.
It can not relieve itself from liability by now suggesting
that the consignee to whom it failed to deliver was engaged
in the effort to defraud the consignor.

It is unnecessary to consider in detail the propositions of law
held and refused by the court. The view of the law which
controlled the court in finding the express company not liable
was in conflict with the view taken by this court, as shown in
what has been above written.

The judgment of the Circuit Court must be reversed and
the case remanded for new trial.

                                   *Reversed and case remanded.*